Appellant, Dean Allen. Thank you. Good morning, Your Honors. This is a First Amendment 1916-1983 case. My client was employed by the City of Boulder City, which is a town outside Las Vegas in Southern Nevada. He was the Information Services Manager, which meant he was in charge of the computer system. And this case goes back to 1999 and involves the city's preparation for the Y2K event, which never happened. As we know, but not everybody was worried about it at the time. Anyway, the city had contracted with Mr. Allen, Mr. Allen had contracted with this company called HTE to make sure that the city's computer systems were Y2K compliant. And they set up a schedule for the... You don't have much time, and I think we're all familiar with the record. Here's the thing I'm interested in. These types of cases, apparently, sort of the motive and intent of both sides make some kind of difference. In other words, was your client acting primarily because he wanted to have his own department? What was the reason why the higher-up city official was acting on the other side? There's more to play some part in this, doesn't it? Absolutely. And how are we supposed to determine that? Well, first, I think that that's a question of fact, which the district judge improperly made a finding on. But secondly, if you look at the record and don't focus on all these things that people said three or four years later, the fact is that if you look at this event, my client was removed from office on September 2nd, the day before the city councilman had gone to the city manager and said, Dean Allen, which is my client, has some concerns about the city's Y2K program. On September 1st, the city manager was told that by the councilman. The next morning, at 8 o'clock in the morning, the city manager, the finance director, and the police chief show up at my client's office, tell him we're concerned about Y2K and whether we're going to succeed. And by the way, you are being removed from office, put on administrative suspension while we investigate this matter, and we're going to change the locks on City Hall. So at that time, obviously, they were concerned about Y2K, which is the issue he had raised to the city council and to the finance director. Well, they may have been, but they also may have been concerned that there was a person in position to sabotage if we don't get him out of here. Well, but if he's the one bringing the problem forward, why would you be worried that he's going to sabotage things? He's saying, my boss won't let me... Well, I'll tell you what the record shows. It shows that they were worried that he might sabotage because he was doing things that they thought were not necessary, and he was insisting that there were problems which they didn't see, and they were concerned about him. Now, I'm not suggesting that's the whole story, but that's, I think, where you need to start to tell us why that's not so. All right. Well, in the record, the company, the outside vendor, actually is the one who was raising the issues about, listen, we can't fulfill our obligation if we're not allowed to come in and do these training sessions. There's an actual email that they wrote in late August of 1999 saying, we have concerns. If this isn't resolved, we're not going to be able to complete our program. This is an outside vendor. This is not my client. It's that email which went to the finance director which triggered a lot of these events. But they've never said, they never got an affidavit from HT, which is this outside vendor, saying, oh, we really weren't serious about this. This really wasn't an issue. This was a big issue for them. And that's the neutral part. I mean, obviously, the city people are going to have their position. My guy's going to have his position. But it's this neutral vendor, which is the one who actually brought the issue forward and said, we cannot complete our program unless you let us do these trainings. What about the, your client made certain statements in his deposition that essentially said he, I don't know if he inflated or he overrated the Y2K concern. Obviously, if those statements are made in there, you know, that has to be part of the evidence and as admissions in terms of that, if you can take that as an admission that it wasn't of a public nature, that he was not aware of the Y2K concern. And he just sort of overstated that to go in and talk to him. What do you do with that? Well, again, I think part of the problem is we're looking backward and saying, well, Y2K, that was no big deal. At the time, it was a big deal. And he was in charge of this. And people were predicting a lot of things. His memo dated the first. When you're talking about his deposition, you know, we have to take the facts most favorable to the plaintiff. It's a summary judgment. But there is that deposition testimony. And that, you know, that really is not, that statement has to be factored in there when the court's looking to whether he was making a statement of public concern. Well, his statements dealt with whether the Y2K program would be implemented, which everyone agreed. And the reason I think that this became such a big issue was everybody panicked when it became clear that this outside vendor, which was responsible for the Y2K program, said, we can't do it. What do you reckon shows that everybody panicked? Well, the fact that the day, the next morning, they show up with the police chief and escort him off the property. And here's what he said in his deposition. I'm speaking of the city manager. He said. Well, they didn't escort him off the property because they were concerned about Y2K. They were concerned about his sabotaging. That's why he got escorted. Well, that's what they say. But what happened? He never there's no end. This guy worked for the city for 10 years. He was he had perfect evaluation. He was exemplary employee. All he did was say, look, we're having the vendor that I'm dealing with says I can't complete the Y2K program. Let me ask you this. Is there anything in the record either way that would support or refute the fact that he was in a position to cause some kind of disruption to the Y2K program? I mean, could he do something like could he, you know, erase the software or whatever they had there? Well, he was in charge of the computers. Yes, he could. But if you take him out of there, then then somebody else could do that. I mean, one of the reasons you I mean, in a case like this from the from the the bad people, they want to get out there so we can't show them what happened. Oh, but the question would be when you say somebody else could do it. I mean, you know, someone else wouldn't have any motive to do it. Right. But he had no motive. That's the point. The point is he had never done anything wrong. This is the guy. This is the guy that came forward, said, look, there's a problem. It's not a matter of the motive only. It's not that he did something wrong. It could come from the feeling that he was mistreated, that he should have, you know, had his own department. He shouldn't have to report to report to this bozo who didn't know what was going on. That kind of right. Well, again, that that could I mean, that would be the question of fact. But if you take a 10 year employee with an exemplary record and an outside vendor who says we can't complete the program and he comes forward and tries to tell the boss and the boss just ignores him and then he finally goes to the city council and says, you know, he doesn't hold a press release or do something outrageous. He goes quietly. The city council says, look, there's a problem. And the next day he's suspended and they say, oh, we're worried you're going to we're going to destroy the city's computer program. I mean, there's nothing that would say this guy was that type of person. He's the good guy. And so they turn around and pin it on him. Now, maybe that's the issue for the jury and the jury has to decide that. I do have a question about that. You know, obviously, we got it. We got to figure out what the what the facts are, giving the all inferences most favorable to your client. But I think that the court does have to make some legal inquiries based on those facts, that body of facts. Absolutely. And that isn't necessarily I mean, you take those facts most favorable to your client, to your your your client. But then the court has to make as a matter of law, some determination, determination of whether this was in the public interest. And I think the Pickering balancing test is a legal is something legal that the court has to go through, but not not resolve factual disputes. Just take the most favorable to your client and then do that legal analysis. Am I wrong? No. And actually, the matter of public concern, the first part of the Pickering balancing is a legal question that the judge below found against my client. I believe that was clearly a wrong legal conclusion, given the significance of what's at issue. And again, I'm sorry. What was that conclusion? The judge down below on the matter of public concern said that this was not a matter of public concern as a matter of law. And I just don't think based on these facts, you can find that, you know, everybody agreed that Y2K was a big issue. Everyone agreed that this outside vendor said there's problems with getting this completed. And my client brought that forward. That's not something which is a personnel issue. And it wasn't a routine issue. It wasn't something that he would normally do. And he also went outside. I mean, he talked to his boss first, but then he went outside and went to the city council, which is like coming to a city council meeting. You only have about 30 seconds left. Do you want to reserve that for rebuttal? Could I please, Your Honor? Thank you. Good morning. My name is Mark Richard. I'm here for the city of Boulder City. With the court's permission, I would like to split my 10 minutes with Mr. Beatty, who represents the two individual defendants in this case. And evenly? Well, he would like that, Your Honor. Yes. Evenly. Is that something I have to monitor or will you cut me off? I'll tell you when it's five minutes. Great. Thank you. Okay. At some point, you're going to have to tell us why there are no factual issues in this case. Your Honor, and I'll do that right now. I think we've already hit that point. Mr. Sagerbloom brings up factual disputes, but I think that's putting the cart way before the horse because the law is clear that the issue of whether you have a speech regarding a matter of public concern, that is a legal determination. And unfortunately, this doesn't happen all the time, but the trial court is going to have to look at some facts to make that legal determination. And that's just what our court did here. But he still has to give the plaintiff all inferences. No question about that, Your Honor. So I'm not going to... Are you saying that the issue of whether or not, you know, the Y2K program was on track is not an issue of public concern? No, I'm not saying that, Your Honor. I'm saying Mr. Allen's speech, which included a discussion of Y2K as a whole, and Connick tells us, look at content and context and the record as a whole. And that's right in Connick. Looking as a whole, his speech was not a matter of public concern. The kernel of public concern in Y2K, it's the same kernel in Connick. And I would urge the court to review Connick because in that case, the questionnaire that the plaintiff put out asked a very serious question. Do you feel you've been pressured to work for the political campaign of the DA? Something like that. Obviously a matter of public concern, but it was a kernel smooshed down in there where the undisputed facts, no matter how we take... In this case, then, what's your position as to what the primary thrust or the primary burden of the plaintiff's overall comments were? Three explanations, Your Honor. Number one, he himself admitted that at the time of Y2K, he knew it was no big deal. He himself admitted at the time of Y2K, in his own head, he knew he had all the bases covered, the city was fine. Well, he said that it wasn't going to crash. It wasn't going to crash. I mean, I don't know that he said those things, no big deal. I think that you're taking a little license there. Your Honor, I apologize if I overstated it, but I think it is clear he said he didn't think it was going to crash. He had duplicate systems in place. Number two, he approached two city councilmen, and this is undisputed. Both of them testified that what he really was talking about was he hated his boss. He hated Bob Kenney. He wanted his own department. It was a personality dispute. In fact, one of them even went so far as to say 95% of what the guy was telling me was he wanted his own department. He didn't like Bob Kenney. And the motivation is helpful, the motivation of the speaker, and the cases agree on this, is helpful to determine whether you've got a matter of public concern. Finally, number three that's very important is the councilman, Mr. Nix, said, well, let's sit down with Kenney and Sullard and talk about this. He had absolutely no interest in doing that. That, I think, is another thing that puts his speech in context. It wasn't to solve the Y2K problem. It was to get himself out from under what he thought, by the way, he thought his boss was a menace. He thought his boss's evaluations of him were comical. And he brought up the Y2K thing, and in his own words, to tactfully escalate the dispute between himself and Kenney. That's using a First Amendment kernel to push forward your own personal agenda. I guess playing the devil's advocate on this, I think what the appellant would say is it wouldn't be like I was talking Y2K. He is a computer person, and it was pretty close to Y2K, too, right? Yes, you're right. So it's not as if I just went in and dropped the word Y2K, and I'm a judge, and then I complained about other things. Understood. It was his job to talk about it, but by the same token, taken in context, it was just one part of his agenda, and it was not the part that I think really mattered to him. You know, part of the context of this also, the city thought it was a big deal, right? Otherwise, they wouldn't have, you know, thrown him out of City Hall on a minute's notice. And, Your Honor, I think that the mayor had a lot of pressure at the time, way beyond Y2K. The 9-11 phone system, all the city computers hinged on this one man. Very unusual situation, and I think it takes it out of the realm of any other case that talks about suspensions or removal from the workplace. And I would like to, in my last few seconds, remind the Court about Mount Healthy, because I think it is a very important case that needs to be considered here, regardless of what this Court may decide as a matter of law on the public concern issue. Under Mount Healthy, when you look at the independent audits and everything else that went on, the city had more than enough reason to terminate him, and there should be no liability anyway. All right, thank you. If there's no more questions, I'm going to yield to you. I'm keeping your co-counsel's time here. I'll try to use effectively whatever I've got, Your Honor. Tom Beatty on behalf of the defendants, Bob Kenny and John Sellard, individual defendants. May it please the Court, counsel. If I can, I'll try to answer a couple of questions that were asked earlier. One, there was a question as to whether or not the admissions that Mr. Allen actually made about Y2K, a matter of public concern. He specifically said he had a high confidence level that problems would be minimal. That's in the excerpts of record at 96 and 97. He knew that the city was ready. He had, quote, standby systems, hardware and software in place. If there were issues, again, excerpt of record at 97. He had done testing of the key components. In addition, when we're talking about the control issue, the internal structure, the question was asked, how did he have control? How was he the one that could do everything? Well, this came up in a number of different ways. They had the hit-by-a-truck theory that was mentioned, really concerned. If this guy's gone, they have nothing. From cradle to grave was the phrase. This guy was in control. Cradle to grave, excerpt of record at 108. He controlled everything, 155. It's a management issue that one person's in control of the system, 230. From a management standpoint, I can't have the person in charge of the system make his predictions come true, the exact point that was made by the court. Now you're doing the qualified immunity thing, right? Well, except you're arguing the same thing he argued. Right. The qualified immunity. The qualified immunity. Let me put it in context. If, hypothetically speaking, if we were to rule against the city, does that also mean you lose? No, it does not. Why not? We still have qualified immunity because we are still protected by that because, simply put, until we have the law regarding qualified immunity in this kind of a factual pattern with the fact-sensitive pickering balancing required isn't clearly established. Pretty clear since Connick v. Myers, isn't it? Not really. Well, if we're going to look to Connick as the key case, then yes, it was, but it's not in favor of the plaintiff. It's in favor of the defense. No, but the assumption of the question is that the city loses under Connick. I don't think the city would lose under Connick, but nevertheless, with Kennedy and Seller. But you're fighting the assumption. Obviously, you don't have to get the qualified immunity if the city wins. Right. So, one. You're not answering the question. The question is, if the city loses under Connick v. Myers, you lose, too. No, I'm respectfully suggesting. Because? Because it is not clearly established to the extent that this particular, these two individuals would actually know and be. Do you have a case that X and Y should have known better? Well, if it's a mixed motive. We aren't going to have that in Endre Perseau v. Haugen. If it's mixed motive, let's just say if it's mixed motive, that maybe there is the public concern there or there's a factual dispute on that. But then you've got, on the qualified immunity, you deal with saucier, right? Right. We still have saucier. A reasonable mistake. Even if, yeah, even if maybe the first element would be satisfied, then you would rely on the second prong of saucier, correct? Correct. A reasonable mistake about what applies in the particular circumstances, particularly since Perseau v. Haugen just suggested that the whole qualified immunity requires a more particularized view and look at specific cases on point. That was the Fourth Amendment excessive force case. But clearly that's no more complicated than the First Amendment public employee v. Well, it seems to me your best argument would be, and I could be wrong, but the best argument would be that assuming that they don't, that the city doesn't prevail on summary judgment, that it wouldn't be obvious to a reasonable person that when they had an employee that was in charge of all of these systems and they were concerned about that employee having, in fact, not liking this Kenny, that they might sabotage this, that it wouldn't be obvious to a reasonable person that they couldn't take some sort of personnel action. Exactly. That's precisely what they did do. That's why they said they did what they did. They can't, and the one quote that I gave earlier really suggests that's exactly the reason why they did it. Now, in addition. Now, I mean, a court could determine that they didn't have the right to do it and that they could lose on it. Right. But what you're saying is on the second prong of saucier it wouldn't be obvious. It wouldn't be obvious. And further, don't forget, don't we shouldn't miss the practical aspect of what we're doing. If we're going to say that we deny qualified immunity to these two, what we're really saying is we're going to hold these two individuals who are not lawyers, who are not judges, we're going to hold them to a higher standard than the district judge himself has held to in this particular case. And the rule for qualified immunity. Unfortunately, no, we've done that before. You know that. But it's still a practical problem. Personally, but for the court as an institution, I mean. Actually, your time's up. Thank you. I think we have your argument well in line. Thank you. Thank you. I think. Don't leave yet. He has 30 seconds. I know you're anxious to get away, but. Thank you. Obviously, we all have hindsight on this deal. But if you just look at what when I asked the city manager what the councilman told him, he said the councilman told him that Dean was telling him there was a Y2K problem. So right there it shows that the Y2K was the big issue. And then when they asked the city manager why he suspended Dean, he said it's because Dean was predicting a Y2K problem, and if it wasn't going to happen, then he could make it happen. Now, that goes to his mentality. If, in fact, he wanted to get rid of Dean because he had gone to the city council, then that would be illegal and that would be outside the scope of qualified immunity. If that was his real basis, then it would be protected by qualified immunity. But those are factual issues that I don't think can be resolved here. All right. Thank you both for your arguments, and that matter will now stand submitted.
judges: Farris, Tashima, Callahan